UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON LEE NORRIS,<br><br>                              Petitioner,<br><br>        v.<br><br>DEBRA DEXTER, Warden,<br><br>                              Respondent. | Civil No.    07cv0945-J (POR)<br><br>**REPORT AND RECOMMENDATION THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED WITH PREJUDICED**<br><br>**[Doc. No. 1]** |

## I. INTRODUCTION

On May 23, 2007, Petitioner Brandon Lee Norris ("Petitioner"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. Petitioner alleges the following claims: (1) ineffective assistance of appellate counsel; (2) ineffective assistance of trial counsel; (3) trial court errors; (4) prosecutorial misconduct; and (5) insufficiency of evidence.  (Petition at 6-10.)

After a thorough review of the Petition, Respondent's Answer, Petitioner's Traverse, and all supporting documents, this Court finds that Petitioner is not entitled to the relief requested and RECOMMENDS the Petition be DENIED with prejudice

## II. PROCEDURAL BACKGROUND

In the Superior Court of the State of California, for the County of San Diego, Petitioner was tried and convicted by a jury of first degree murder, based on the January 10, 2002, killing of Petitioner's wife, Lori Norris, pursuant to California Penal Code §§ 187(a) and 189.  The jury further determined that Petitioner personally used a deadly or dangerous weapon during the

commission of the murder in violation of California Penal Code § 12022(b)(1).  (Lodgment 1, vol. 2 at 218, 289.)  The superior court sentenced Petitioner to serve an indeterminate term of 26 years to life in state prison.  (Id. at 289, 332.)

Petitioner appealed the judgment to the California Court of Appeal.  He argued the trial court erroneously admitted evidence of hearsay statements made by the victim, and that this error violated his Sixth and Fourteenth Amendment rights to confrontation.  (Lodgment 3.)  In a reasoned opinion filed September 1, 2004, the California Court of Appeal found that Petitioner failed to preserve the issue for review by failing to make a timely and specific objection to the hearsay evidence in the trial court, and denied Petitioner any relief.  (Lodgment 6.)

Petitioner filed a petition for review in the California Supreme Court, in which he raised the same issue presented to the court of appeal.  (Lodgment 7.)  The California Supreme Court denied his petition on November 17, 2004.  (Lodgment 8.)

On December 2, 2005, Petitioner filed a petition for writ of habeas corpus in the California Superior Court.  (Lodgment 9.)  In a written order filed January 20, 2006, the superior court rejected Petitioner's claims.  (Lodgment 10.)

On March 10, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (Lodgment 11.)  On May 17, 2006, in a written order, the court of appeal denied the petition.  (Lodgment 12.)

On September 11, 2006, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  (Lodgment 13.)  On April 11, 2007, the California Supreme Court summarily denied the petition.  (Lodgment 14.)

### III. FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion in People v. Norris, No. SCD 164985, slip op. (Cal. Ct. App. Sep. 1, 2004).  (Lodgment 6.)  The Court presumes these factual determinations are correct pursuant to 28 U.S.C.A. § 2254(e)(1).

*A. Prosecution Evidence*

Norris and his wife Lori were both in the Navy. They had a son, Dante, who was born in 1999. From March 2001 to October 2001, Lori was stationed in Maine and Norris was stationed in San Diego. During this time period, Lori began an extra-marital affair with another Navy sailor named Jeffrey Ocampo. In the spring of 2001, Norris had a six-week

affair with a woman named Kay Smith. From July 2001 to October 2001, Norris also had a friendship with another woman named Alexis Marosi. Marosi slept with Norris in his bed many times, and they kissed and "cuddle[d]" together, but never had sex.

In September 2001, while Lori was on leave in San Diego, she and Norris mutually agreed to separate. The next month, however, Norris and Dante traveled to Galveston, Texas, where Lori's ship was being commissioned. After this visit, Lori broke off her relationship with Ocampo and Norris stopped seeing Marosi.

Lori's ship returned to San Diego in November 2001. Shortly afterward, Lori resumed her affair with Ocampo. After Thanksgiving, Norris began having an affair with a coworker named Brandi Kauffman. Norris told Kauffman that he and Lori were living together because of their son, but that they led separate lives, and Lori was seeing somebody else. Two days after Thanksgiving, Kauffman called Lori and confirmed that she was seeing somebody else. According to Kauffman, her relationship with Norris continued until Lori's death. Kauffman spent nights at Norris's apartment when Lori was gone. During this time period, Lori and Norris decided to get a divorce.

On New Year's Eve, Lori told Norris that Ocampo was her boyfriend. Norris became upset.

On January 2, 2002, Norris came to Lori's ship while she was working. They argued and Lori began crying. Norris left the ship.

On the evening of January 9, 2002, Lori went to a movie with Ocampo. Afterward, she decided to spend the night at Ocampo's apartment. Sometime after midnight, Lori called Norris to tell him that she would not be coming home that night, and that she would be home in the morning to pick up her work uniform. The next morning, Lori asked Ocampo if she could borrow some of his work clothing so that she would not have to return home. Ocampo agreed. Lori left Ocampo's apartment around 6:15 a.m. Ocampo did not walk her out of the apartment.

According to his cellular telephone records for the morning of January 10, 2002, Norris made numerous attempts to reach Lori on her cellular telephone from 4:32 a.m. until 6:14 a.m. At 6:13 a.m., Norris called his employer and left a message saying that he had a flat tire and would be late to work. Around 6:25 or 6:30 a.m., a witness observed Norris's car parked behind Lori's car in a parking lot near Ocampo's apartment. Norris's car backed up, turned into a parking stall, and then drove away. Lori's car remained parked in the same spot.

A few hours later, another witness noticed someone inside Lori's car. The witness called the police. When the police arrived, they discovered Lori's dead body in the back seat of her car. She was hanging from a cord that was wrapped twice around her neck and tied to the clothes hook above the window. The cord had been ripped from a mesh storage pouch inside the vehicle. Lori also had 230 puncture wounds to her head, neck, chest, and left hand and arm. Some of the injuries were defensive wounds. The cause of death was multiple stab wounds and hanging. Lori was still alive when she was hanged, but there was no sign that she resisted the hanging.

Norris dropped Dante off at his daycare center between 7:30 and 8:00 a.m. that morning. He usually dropped Dante off between 6:00 and 6:30 a.m. In the sign-in book, Norris wrote that he had dropped Dante off at 6:30 a.m. Norris arrived at work between 8:00 and 8:30 a.m.

That night, Norris called his friend, Erica McGrath, and asked her to go to his apartment and get rid of something in the dishwasher. She refused. The next day, the police recovered an awl from Norris's dishwasher. The awl was part of a tool set, the rest of which was discovered in the front passenger area of Norris's vehicle. The stab wounds could have been inflicted by the awl.

Ocampo had been in Lori's car two days before she was killed. He had not seen an awl in the car. Lori had never talked to him about etching the dashboard of her car.

*B. Defense Evidence*

Norris testified in his own defense. He admitted that he had killed Lori by stabbing her with the awl and strangling her with a cord.

According to Norris, he and Lori had agreed to separate in November 2001. They continued living together and completed some paperwork for a divorce. However, Norris was "furious" when Lori told him on New Year's Eve that the other person she had slept with was Ocampo. Norris had met Ocampo in Texas and bought him a beer. He felt "disrespected" by Ocampo.

On January 4, 2001, after Dante told Norris that he had seen Lori and Ocampo kissing, Norris confronted Lori at work on the ship. That night, Norris packed up all of Lori's belongings in boxes. When she returned in the morning, he gave her some money and told her to move out of the apartment. However, Lori convinced Norris to let her stay. They decided to make one more attempt to reconcile, and they agreed to break off their other relationships. According to Norris, he told Brandi Kauffman that he could not see her anymore.

On January 9, 2002, Lori told Norris that she was going to the movies with Ocampo. Norris was angry and suspicious, but Lori assured him that he had nothing to worry about because they were going out only as friends. She said she would be home that night. Sometime after midnight, however, Lori called Norris and said she would not be coming home.

Early the next morning, Norris repeatedly attempted to call Lori. He finally drove to Ocampo's house, because he wanted to talk to Lori about their relationship. Dante was asleep in Norris's car. On the way to Ocampo's house, Norris called work and left a message saying that he had a flat tire and would be late.

As Norris approached Lori's parked car, he saw two people hug and kiss. When the woman walked away and got into her car, Norris realized it was Lori. She started to drive away. Norris pulled up behind Lori and flashed his headlights at her. She pulled over into the parking lot and Norris got into her car. Lori asked him what he was doing there. He said he just wanted to talk.

Norris and Lori started arguing and shouting. After they had finished arguing, they sat in the car in silence. Norris reached over to hold Lori's hand. She pulled her hand back and slapped him. Norris punched her, and Lori fought back.

Norris grabbed the awl from the cup holder of Lori's car near the gearshift. He had given the awl to Lori about a week or a week and a half earlier, because she wanted to use it to etch her name in her dashboard. Norris admitted stabbing Lori repeatedly with the awl, but he did not realize he was doing it at the time. Lori fought back. At some point, they fell into the back seat. Norris continued stabbing her. He remembered grabbing the rope in the back seat, but could not recall wrapping it around Lori's neck or hanging her. Later that day, he realized what he had done with the rope. When Norris left, Lori was in the back seat of the car, bleeding and motionless. Norris ran to his car and drove away.

In closing argument, defense counsel argued that the killing was not premeditated, and that Norris was guilty of either voluntary manslaughter or second degree murder, but not first degree murder.

///

///

# IV. STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).  As amended, the AEDPA now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

28 U.S.C.A. § 2254(d) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  See <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final.  <u>Williams v. Taylor</u>, 520 U.S. 362, 406 (2000).  Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003).  However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000).  Only after the clearly established federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established federal law.  See <u>Lockyer</u>, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court

confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams, 529 U.S. at 405-06. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. Under Williams, an application of federal law is unreasonable only if it is "objectively unreasonable." Id. at 409.

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law. If a state court fails to provide a reasoning for its decision, habeas review is not de novo, but requires an independent review of the record to assess whether the state court erred in its application of controlling federal law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

## V. DISCUSSION

### A.    Ineffective Assistance of Counsel

####     1.    Legal Standard

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law determined by the Supreme Court of the United States"); Jones v. Wood, 114 F.3d 1002, 1013 (9th Cir. 1997). A habeas petitioner must satisfy two requirements to demonstrate his assistance of counsel was so defective that habeas relief is warranted. First, the petitioner must show that counsel's performance was deficient. Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

1  defendant by the Sixth Amendment." Id.  Second, the petitioner must show counsel's deficient

2  performance prejudiced the defense.  Id.

3      Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but

4  for counsel's unprofessional errors, the result of the proceeding would have been different.  A

5  reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at

6  694; see also Fretwell v. Lockhart, 506 U.S. 364, 372 (1993).  Further, Strickland requires that

7  "[j]udicial scrutiny of counsel's performance ... be highly deferential." Strickland, 466 U.S. at 689.

8  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable

9  professional assistance." Id. at 686-687.  The Court need not address both the deficiency prong and

10  the prejudice prong if the defendant fails to make a sufficient showing of either one.  Id. at 697.

11      **2.      Ground 1 - Ineffective Assistance of Appellate Counsel**

12      Petitioner contends that he received ineffective assistance of appellate counsel, arguing that

13  counsel raised none of the issues Petitioner instructed him to raise.  (Petition at 6; Traverse at 5.)

14  Petitioner also claims that appellate counsel failed to raise any arguable issues.  (Id.)

15      The standard for assessing the performance of trial and appellate counsel is the same.

16  Morrison v. Estelle, 981 F.2d 425, 427 (9th Cir. 1992), cert. denied, 508 U.S. 920 (1993); Miller v.

17  Keeney, 882 F.2d 1428, 1433-34 (9th Cir. 1989).  With respect to claims of ineffective assistance of

18  appellate counsel, this means that a petitioner must demonstrate that he would have prevailed on

19  appeal absent counsel's errors.  Robbins, 528 U.S. at 285 (2000) (citing Smith v. Murray, 477 U.S.

20  527, 535-36 (1986)).

21      Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's

22  two-pronged test.  Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle,

23  792 F.2d 846, 847 (9th Cir. 1986); see also Penson v. Ohio, 488 U.S. 75, 109 S.Ct. 346, 353-54, 102

24  L. Ed. 2d 300 (1988) (holding that where a defendant has been actually or constructively denied the

25  assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is

26  presumed; the implication is that Strickland does apply where counsel is present but ineffective).

27      To prevail, a petitioner must show two things.  First, he must establish that appellate

28  counsel's deficient performance fell below an objective standard of reasonableness under prevailing

1  professional norms. <u>Strickland</u>, 466 U.S. at 687-88.  Second, a petitioner must establish that he

2  suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

3  errors, he would have prevailed on appeal. <u>Id.</u> at 694.

4  The presumption of reasonableness is even stronger for appellate counsel because he has

5  wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as

6  one of the hallmarks of effective appellate assistance. <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 (9th

7  Cir. 1989).  Appealing every arguable issue would do disservice to a petitioner because it would

8  draw an appellate judge's attention away from stronger issues and reduce appellate counsel's

9  credibility before the appellate court. <u>Id.</u>  Appellate counsel has no constitutional duty to raise every

10  nonfrivolous issue requested by a petitioner. <u>Id.</u> at 1434 n.10 (citing <u>Jones v. Barnes</u>, 463 U.S. 745,

11  751-54, 103 S.Ct. 3308, 77 L. Ed. 2d 987 (1983)).

12  Here, Petitioner lists several issues he believes appellate counsel should have raised: (1) trial

13  court's errors of practice and procedures; (2) ineffective assistance of trial counsel; and (3)

14  insufficiency of evidence.  (Petition at 6.)  However, Petitioner fails to demonstrate how appellate

15  counsel's performance fell below an objective standard of reasonableness by not raising these issues

16  on appeal.  Appellate counsel did not have a constitutional duty to raise these issues, in addition to

17  issues she did raise related to the admission of Ms. Norris' hearsay statements. <u>See Miller</u>, 882 F.2d

18  at 1434.  Appellate counsel would have done a disservice to Petitioner by raising every arguable

19  issue. <u>See Id.</u>  Further, Petitioner fails to show a reasonable probability that, but for counsel's

20  failure to raise these issues, he would have prevailed on appeal. <u>See Strickland</u>, 466 U.S. at 694.

21  Accordingly, this Court RECOMMENDS the Petition be DENIED based on this ground for relief

22  since Petitioner has not met his burden under <u>Strickland</u>.

23  **3.      Ground 2 - Ineffective Assistance of Trial Counsel**

24  Petitioner argues his Sixth Amendment right to effective assistance of counsel was violated

25  when his trial counsel: (1) failed to object to hearsay testimony, (2) failed to ensure presentation of

26  probative evidence and expert testimony necessary to the defense, (3) failed to object to the

27  readback of hearsay testimony during jury deliberations, (4) failed to object to trial court's denial of

28  the jury's request to review evidence, and (5) failed to object to the instruction that the jury need not

1  reach a unanimous verdict for guilt.  (Petition at 7.)

2  **a.   Hearsay Testimony**

3  Petitioner claims that, during the in-limine hearing, hearsay testimony of Jeff Ocampo was

4  ruled inadmissable and hearsay testimony of Irish Kelly was ruled admissible only if accompanied

5  by a cautionary limiting instruction.  (Traverse at 7.)  Petitioner further claims that said testimonies

6  were then presented at trial with no accompanying cautionary instruction.  (Id.)

7  Petitioner misrepresents the trial proceedings.  During the in-limine hearing, the trial court

8  did rule inadmissable Ocampo's testimony that Petitioner brought his brother to Galveston, Texas,

9  and that his brother had a gun.  (Lodgment 2 at 47-48.)  The trial court also ruled that Kelly's

10  testimony that the victim had told her about controlling aspects of Petitioner's behavior must be

11  accompanied by a cautionary limiting instruction, if presented at trial.  (Lodgment 2 at 51, 54-55.)

12  However, after a thorough review of the trial transcript, this Court finds that neither witness gave the

13  questioned testimony at trial.  (Lodgment 2.)

14  **b.   Not Presenting Expert Testimony**

15  Petitioner asserts that trial counsel was ineffective because he failed to present an expert

16  witness to testify at trial.  (Petition at 7.)  Petitioner argues he needed an expert to support his

17  position that his "'reason' was obscured by passion, sending [him] into a 'violent rage,' upon the

18  instant provocatory [sic] act of being slapped in the face."  (Traverse at 19.)

19  Petitioner fails to establish that trial counsel's decision not to have an expert witness testify

20  rendered his performance deficient.  Trial counsel's representation of Petitioner appears reasonable

21  even without the use of an expert witness.  Although trial counsel did not call an expert witness to

22  testify, he utilized the testimonies of Petitioner and Detective Ott to support Petitioner's defense that

23  his actions were not premeditated and there was sufficient provocation to mitigate the murder charge

24  to either second degree murder or voluntary manslaughter.  (Lodgment 2, Vol. 4 at 688-715.)  In

25  support of this defense, trial counsel primarily focused on Petitioner's testimony.  Petitioner testified

26  that (1) he drove to Ocampo's apartment with his son, (2) at the time he decided to drive to

27  Ocampo's apartment he intended to talk to his wife, (3) the thought of going to Ocampo's apartment

28  to kill his wife did not enter his mind, and (4) he did not have the intent to harm his wife when he

1   arrived at Ocampo's apartment.  (Lodgment 2, Vol. 4 at 602-3, 668-9.)

2          In his closing argument, trial counsel emphasized Petitioner's testimony and the fact that he

3   drove to Ocampo's apartment with his son to illustrate his actions were not premeditated.

4   (Lodgment 2, Vol. 4 at 688-715.)  Additionally, trial counsel reminded the jury of Detective Ott's

5   testimony regarding the letter "B" etched on the dashboard of Ms. Norris' car, arguing that this

6   supported Petitioner's testimony that the awl was already in his wife's car and that he did not bring

7   it with him.  (Id. at 506-10.)

8          Furthermore, there is no evidence in the record suggesting that Petitioner required an expert

9   witness.  Petitioner does not contend he was entitled to an expert because trial counsel should have

10  asserted a defense of diminished capacity or insanity.  Plaintiff does not argue, and there is no

11  evidence in the record, that he suffered from diminished capacity, insanity, or any other mental

12  illness such that an expert witness was necessary to Petitioner's defense.  There is no indication from

13  the record that the trier of fact required the testimony of a person with special knowledge, skill,

14  experience, training, or education.[1]  Based on trial counsel's defense strategy, it does not appear that

15  an expert witness was necessary in this case.

### c.        Readback of Testimony to Jury

17         Petitioner argues trial counsel failed to object when the trial court permitted a "customized"

18  readback of testimony during jury deliberations.  (Petition at 7.)

19         Petitioner fails to demonstrate trial counsel's failure to object constituted deficient

20  performance since there is no indication in the record that the trial court "customized" the readback

21  of testimonies.  In fact, the trial court took extra steps to explain CALJIC 17.48[2] and noting it was

22  not going to "customize" readbacks of testimonies by explaining:

23              "On a note on any requests that might come out of the jury for readbacks,
                occasionally jurors will say 'Well, I'd like to hear all the testimony – or we'd like
24              to hear all testimony that relates to this subject from one or two or three
                witnesses.'  And we cannot do that for you because it would mean counsel and I

25

26         [1] A person is qualified to testify as an expert if he has special knowledge, skill, experience,
    training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.
27  Cal. Evidence Code s. 720(a).

28         [2] CALJIC 17.48 states, in pertinent part, "you may write the court requesting that the reporter
    readback [] relevant proceedings."  (Lodgment 1, Vol. 1 at134, 205.)

1  are picking and choosing everything that may or may not apply to that issue, and
   it's just too dangerous.  We might leave out something that's crucial or include
2  things that shouldn't have been included.  And so we don't want to stress anything
   or leave anything out.
3          We generally will reply to you, if you are requesting a readback, we will
   offer the entire witness's testimony as a readback rather than portions that might
4  be picked out.  And then once the readback starts, it goes from the beginning of
   that witness all the way to the end unless all 12 jurors are satisfied that they heard
5  enough.  And the reporter can then stop reading in the middle."

6  (Lodgment 2, vol. 4 at 755-56.)

7        The record shows the jury requested readbacks of the testimonies of Irish Kelly and

8  Petitioner.  (Lodgment 1, vol. 2 at 234, 240.)  The trial court did not select portions of either

9  testimonies, but rather provided the jury with their entire testimonies and reiterated that the readback

10 may only be terminated upon the agreement of all twelve jurors.  (Id. at 235, 345.)

11       It appears that Petitioner is arguing his trial counsel failed to object to a situation that did not

12 arise.  Based thereon, Petitioner cannot show that trial counsel's performance was deficient or that

13 he was prejudiced.

14            **d.**      **Denial of Evidence for Jury Review**

15       Petitioner does not specifically state what evidence the jury requested to examine during

16 deliberations.  However, it appears from the Court's thorough review of the record there was one

17 instance when the trial court denied the jury's request to "see the car (red saturn)" where Ms. Norris

18 was killed.  (Lodgment 1, vol. 2 at 234-35.)  The trial court explained its denial by stating "[t]he car

19 itself was not entered into evidence."  (Id.)

20       Petitioner fails to demonstrate how trial counsel's performance was deficient by not

21 objecting to the trial court's denial of the jury's request to view an item not entered into evidence.

22 Additionally, Petitioner does not show how he was prejudiced by counsel's failure to object.  Thus,

23 Petitioner fails to meet his burden under Strickland.

24            **e.**      **Unanimous Verdict Jury Instruction**

25       Petitioner claims trial counsel should have objected when the jury was instructed it need not

26 reach a unanimous verdict to find guilt.  (Petition at 7.)  However, both the written jury instructions

27 and the trial court's verbal jury instructions provided that a unanimous jury vote was necessary to

28 find Petitioner guilty of first-degree murder.  (Lodgment 2 at 735; Lodgment 1 at 121.)

1    Given that Petitioner fails to even demonstrate that these issues were present at trial, he falls

2    short of his burden to show how trial counsel's performance was deficient with regard to these

3    issues or how his defense was prejudiced.

**f.    Conclusion**

5    Based on the fact Petitioner fails to demonstrate trial counsel was ineffective as to each of his

6    claims in ground 2, this Court RECOMMENDS the Petition be DENIED based on this ground for

7    relief.

8   **B.    Procedural Default**

9    Respondents argue grounds 3, 4, and 5 of the Petition are procedurally defaulted because

10   Petitioner failed to properly present those claims to the state courts.  (Answer at 11-16.)

11   A state procedural default arises from the "adequate and independent state law doctrine,"

12   which provides that the United States Supreme Court lacks jurisdiction to review a judgment of a

13   state court which "rests on a state law ground that is independent of the federal question and

14   adequate to support the judgment."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991).  On direct

15   review of a state court judgment, the resolution of a federal claim would not affect a judgment which

16   rests on a state ground independent of the federal claim.  <u>Id.</u>  The Supreme Court would, in effect, be

17   issuing an advisory opinion on the federal claim, something the Court lacks jurisdiction to do.  <u>Id.</u>

18   The adequate and independent doctrine has been extended to federal habeas actions.

19   Although a federal habeas court does not review a judgment of a state court, it decides whether a

20   state prisoner is in custody in violation of the Constitution or laws of the United States.  <u>Id.</u> at 729-

21   30.  When the "adequate and independent ground" for a state court's rejection of a federal claim

22   involves a violation of state procedural requirements, a habeas petitioner has procedurally defaulted

23   his claim, and this Court cannot reach the merits of the federal claim.  <u>Id.</u>  To do so would allow a

24   habeas petitioner to avoid the limitation on direct review by the Supreme Court, avoid the habeas

25   exhaustion requirement, and undercut "the States' interest in correcting their own mistakes."  <u>Id.</u> at

26   730-32.

27   However, "a procedural default does not bar consideration of a federal claim on either direct

28   or habeas review unless the last state court rendering a judgment in the case "'clearly and

1   expressly'" states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255,

2   263 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985), quoting Michigan v. Long,

3   463 U.S. 1032, 1041 (1983).).

4        Because procedural default is an affirmative defense, the state must initially plead procedural

5   default.  Bennett v. Mueller, 322 F.3d 573, 585 (9th Cir. 2003).  Once the state has asserted the

6   existence of an adequate and independent state procedural ground as an affirmative defense, the

7   burden shifts to the petitioner who must place this defense at issue by "asserting specific factual

8   allegations that demonstrate the inadequacy of the state procedure, including citation to authority

9   demonstrating inconsistent application of the rule."  Id. at 586.  If the petitioner meets his burden to

10   place the defense at issue, the ultimate burden to demonstrate the adequacy of a state procedural bar

11   is on the State.  Id.

12        Finally, the Court may still reach the merits of a procedurally defaulted claim if the petitioner

13   can demonstrate (1) cause for the procedural default and actual prejudice from the claimed violation,

14   or (2) that the failure to review the claim would result in a fundamental miscarriage of justice.

15   Coleman, 501 U.S. at 750.

16        **1. Hearsay Testimony (Ground 3) and Prosecutorial Misconduct (Ground 4)**

17             **a. Procedural Default**

18        Respondents assert that Petitioner failed to raise the following claims at trial, and is therefore

19   procedurally defaulted: (1) his claim in ground 3, that the trial court erroneously admitted hearsay

20   testimony,[3] and (2) his claim in ground 4, that the prosecutor committed misconduct by offering into

21   evidence the hearsay testimony.  (Answer at 11-14.)

22        Here, the last reasoned state court decision on this issue clearly and expressly stated that

23   denial of the claim rested on a state procedural bar.  (Lodgment 6 at 12.)  The Ninth Circuit has

24   recognized and applied California's contemporaneous objection rule, under which a defendant must

---

26   [3] Petitioner fails to clearly state what testimony he is alleging constitutes hearsay statements of
27   the victim.  In reading the Petition, there is no clear indication whose testimony contained hearsay
     statements. Petitioner simply makes a broad statement that "hearsay testimony" was improperly ruled
     admissible.  (Petition at 8.)  However, the Court's reading of the Petition together with the Traverse
28   seems to indicate that Petitioner is alleging that the testimonies of Ocampo and Kelly contained
     inadmissible hearsay statements.  (Petition at 8; Traverse at 11.)

1   make an objection at trial in order to preserve a claim on appeal, as grounds for denying a federal

2   habeas claim under the doctrine of procedural default.  See Vansickel v. White, 166 F.3d 953,

3   957-58 (9th Cir. 1999).

4        Respondent has asserted that the state appellate court's finding of waiver constitutes an

5   adequate and independent state bar, precluding federal habeas review.  (Answer at 13.)  Therefore,

6   the burden shifts to Petitioner to place this affirmative defense at issue.  Bennett, 322 F.3d at 586.

7        Petitioner, however, has not argued that the state procedural bar is inadequate or that it is

8   inconsistently applied.  Instead Petitioner states "[a]s shown by lodgment  no. 6 (Court of Appeal

9   Opinion) and no. 10 (Superior Court order denying petition) the petitions [sic] claims in grounds

10  three, four, and five, are "procedurally barred" from review."  (Traverse at 9.)  Petitioner has cited

11  no authority and no factual allegations to rebut Respondent's procedural default defense.  Therefore,

12  Petitioner has not met his burden under Bennett.  As a result, his claims in grounds 3 and 4 regarding

13  inadmissble hearsay statements and prosecutorial misconduct, respectively, are procedurally

14  defaulted.

15       Even though his claims are procedurally defaulted, Petitioner fails to demonstrate (1) cause

16  for the procedural default and actual prejudice from the claimed violation, or (2) that the failure to

17  review the claim would result in a fundamental miscarriage of justice.  See Coleman, 501 U.S. at

18  750.

19       He asserts the ineffective assistance of trial counsel is the cause for the procedural default.

20  (Traverse at 10.)  In order to show counsel's ineffectiveness was the cause, he must show that

21  counsel's performance was professionally unreasonable and a reasonable probability that the

22  outcome would be different if the claims in question had been brought.  Williamson v. Jones, 936

23  F.2d 1000, 1006 (8th Cir. 1991).  Petitioner neither shows how trial counsel's performance was

24  professionally unreasonable nor a reasonable probability that the outcome would be different if his

25  claims in grounds 3 and 4 had been brought.

26       Petitioner has also failed to demonstrate that a miscarriage of justice would result absent

27  review of the claim by this Court.  See Coleman, 501 U.S. at 748; Vansickel, 166 F.3d at 957-58.

28       Therefore, the Court is precluded from considering the merits of this claim.  However, even

1   if these claims were not procedurally barred, they lack merit.[4]

2          **b. Merits**

3               **i. Claim that Trial Court and Prosecutor Violated Cal. Evidence Code**

4       One of Petitioner's claims in ground 3 is that the trial court violated California Evidence

5   Code section 1250 by ruling hearsay testimony admissible. (Petition at 8.)  His sole contention in

6   ground 4 that the prosecutor violated California Evidence Code by presenting hearsay testimony.

7   (Petition at 9.)

8       Only certain claims are cognizable on federal habeas review, specifically those which allege

9   a violation of the petitioner's federal constitutional rights.  Title 28, United States Code, § 2254(a),

10   sets forth the following scope of review for federal habeas corpus claims:

11      The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
entertain an application for a writ of habeas corpus in behalf of a person in
12      custody pursuant to the judgment of a State court only on the ground that he
is in custody in violation of the Constitution or laws or treaties of the United
13      States.

14   28 U.S.C. § 2254(a) (LexisNexis 2007).

15       Federal habeas relief is not available for an alleged error in the interpretation or application

16   of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

17       Here, Petitioner cannot seek federal habeas relief on the basis that the California Evidence

18   Code was violated by the trial court ruling hearsay testimony admissible and the prosecutor's

19   presentation of hearsay testimony since federal habeas relief is not available for an alleged error in

20   the interpretation or application of state law.  Estelle, 502 U.S. at 67-68.

21       Therefore, the Court RECOMMENDS the Petition be DENIED on these grounds for relief

---

23      [4]  The Ninth Circuit has indicated that:

[C]ourts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 [] (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. It is wasteful of both our resources and that of the litigants to remand to the district court a case in which that court improperly found a procedural bar, if the ultimate dismissal of the petition is a foregone conclusion.").  Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.

Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).

1  since Petitioner is precluded from bringing these claims on federal habeas review.

2  **ii. Hearsay Statements Not Testimonial**

3  In ground 3, Petitioner argues that the trial court violated Petitioner's rights under the

4  confrontation clause of the Sixth Amendment to the United States Constitution when it admitted

5  hearsay statements of the victim, Lori Norris.  ((Petition at 8; Traverse at 11.)

6  The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions,

7  the accused shall enjoy the right . . . to be confronted with the witnesses against him." In Crawford

8  v. Washington, 541 U.S. 36, 53-54 (2004), the Supreme Court held that this provision bars

9  "admission of testimonial statements of a witness who did not appear at trial unless [s]he was

10  unavailable to testify, and the defendant had had a prior opportunity for cross-examination." In

11  Davis v. Washington, 126 S. Ct. 2266 (2006), the Court noted with respect to the Crawford decision:

12  A critical portion of this holding . . . is the phrase 'testimonial
    statements.' Only statements of this sort cause the declarant to be a 'witness'
13  within the meaning of the Confrontation Clause." [Citation omitted.] It is the
    testimonial character of the statement that separates it from other hearsay that,
14  while subject to traditional limitations upon hearsay evidence, is not subject to
    the Confrontation Clause.
15
    Davis, 126 S. Ct. at 2273.
16

17  In Crawford, the Court discussed what constitute "testimonial statements:"

18  Testimony . . . is typically a solemn declaration or affirmation made for the
    purpose of establishing or proving some fact. [Internal quotations and citation
19  omitted.] An accuser who makes a formal statement to government officers
    bears testimony in a sense that a person who makes a casual remark to an
20  acquaintance does not.

21  Crawford, 541 U.S. at 51. In Davis, the court added that one testifies out of court when he or she

22  acts like a witness. Davis, 126 S. Ct. at 2277. In other words, the determinative question to ask is

23  whether the out of court statement is "a weaker substitute for live testimony at trial." [Internal

24  quotations omitted.]  Id.

25  While the contours of what constitutes "testimonial statements" under Supreme Court

26  precedent at this point have not been precisely demarcated, the statements by Ms. Norris to Ocampo

27  and Kelly are not testimonial statements. Ms. Norris was not acting "like a witness" when she

28  discussed her relationship with Petitioner with them. She was not attempting to establish or prove

1   some fact, but was simply conversing with Ocampo and Kelly when she made her statements. Cf.

2   United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005), cert. denied, 547 U.S. 1012, 126 S. Ct.

3   1487, 164 L. Ed. 2d 263 (2006)(out of court statements from one co-conspirator to another not

4   "testimonial"). In light of Crawford and Davis, the court must reject petitioner's Confrontation

5   Clause claim.

6   **iii. Confrontation Clause Permits Hearsay Statements**

7           Even if Ms. Norris' statements are deemed "testimonial," the confrontation clause permitted

8   the use of her out-of-court statements.  The confrontation clause ensures the reliability of the

9   testimony presented against a criminal defendant.  Maryland v. Craig, 497 U.S. 836, 845 (1990).

10  The right to confrontation may be satisfied absent a face to face confrontation at trial when denial of

11  such right is necessary to further an important public policy and the reliability of the testimony is

12  otherwise assured.  Id. at 850.  The clause permits, for example, the admission of certain hearsay

13  statements despite the defendant's inability to confront the declarant.  Id. at 847-48.

14          The hearsay rules and the confrontation clause are generally designed to protect similar

15  values, but this does not mean that the confrontation clause is no more than a codification of the

16  hearsay rules and their exceptions. Dutton v. Evans, 400 U.S. 74, 81 (1970)(plurality

17  opinion)(quoting California v. Green, 399 U.S. 149, 155-56); see also Ohio v. Roberts, 448 U.S. 56,

18  63 (1980).

19          The confrontation clause permits the use of out-of-court statements when 1) the declarant is

20  unavailable and 2) the statement bears indicia of reliability. Roberts, 448 U.S. at 66; United States v.

21  Holland, 880 F.2d 1091, 1094 (9th Cir. 1989). The reliability is inferred when the evidence falls

22  within a firmly rooted hearsay exception. Bourjaily v. United States, 483 U.S. 171, 182-83 (1987);

23  Roberts, 448 U.S. at 66.

24          A hearsay exception is firmly rooted 'if, in light of 'longstanding judicial and legislative

25  experience,' [citation], it 'rest[s] [on] such [a] solid foundatio[n] that admission of virtually any

26  evidence within [it] comports with the "substance of the constitutional protection."' Lilly v. Virginia,

27  527 U.S. 116, 126 (1999).  This standard is designed to allow the introduction of statements falling

28  within a category of hearsay whose conditions have proven over time 'to remove all temptation to

falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath' and cross-examination at trial. [Citation.]" Id. at 126. "[W]hether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law." Id. at 125 . If, as in Lilly, the proferred statement is inherently unreliable and falls outside a firmly rooted hearsay exception, the prosecution must satisfy the second prong of the Roberts test in order to introduce the statements. Id. at 131, 134.

The California Evidence Code section 1250 state-of-mind exception to the hearsay rule is firmly rooted in California's decisional and statutory law. See Assem. Com. on Judiciary com., 29B West's Ann. Evid. Code (1995 ed.) foll § 1250, pp. 280-281; People v. Alcalde (1944) 24 Cal.2d 177, 148 P.2d 627; see also People v. Morales (1989) 48 Cal.3d 527, 552, 257 Cal. Rptr. 64, 770 P.2d 244 (Morales).) Included within this hearsay exception are statements offered to show the declarant's intent to do a future act, such as draw others into a plot to rob a restaurant or to commit murder.  People v. Sanders (1995) 11 Cal.4th 475, 518, 46 Cal. Rptr. 2d 751, 905 P.2d 420 (Sanders); Morales, supra, at p. 552.)

Here, the declarant, Ms. Norris, is unavailable since she is deceased.  Her statements to Ocampo and Kelly bear indicia of reliability since her statements constitute hearsay statements that fall within a firmly rooted hearsay exception.  Based thereon, the hearsay statements did not violate the confrontation clause.  Accordingly, the Court RECOMMENDS that Petitioner's claim in ground 3 regarding hearsay statements be DENIED on this ground for relief.

**2. Due Process Claims in Grounds 3and 5**

In ground 3, Petitioner asserts his due process rights were violated when the trial court excluded evidence requested by the jury to examine during deliberations, instructed "the jury that a unanimous verdict is not necessary for a factual finding of guilt for the allegation of murder," and allowed "a partial read-back of transcript testimony, contrary to instruction forbidding such." (Petition at 8.)  In ground 5, Petitioner argues there was insufficient evidence to establish guilt beyond a reasonable doubt.  (Petition at 9.)

**a. Procedural Default**

Respondent argues these claims are procedurally defaulted because Petitioner failed to raise

them on direct appeal.  (Answer at 14-16.)  Specifically, Respondent contends that a "defendant who could have raised a claim on direct appeal but did not will be barred, under the <u>Dixon</u> bar, from raising that claim on habeas corpus."  (<u>Id.</u> at 14.)  According to Respondent, Petitioner has raised his due process claims in grounds 3 and 5 in state habeas petitions presented to the California Superior Court and the California Supreme Court.  (<u>Id.</u> at 15.)  The California Superior Court invoked the <u>Dixon</u>[5] rule when it refused to address those claims because they "could have been, but were not, raised on timely appeal from a judgment of conviction."  (Answer at 15; Lodgment 10 at 4.)  Respondent contends denial of these claims by the California Superior Court and the California Supreme Court constitutes an adequate and independent state bar.  (Answer at 13.)  Therefore, the burden shifts to Petitioner to place this affirmative defense at issue.  <u>Bennett</u>, 322 F.3d at 586.

As previously discussed, Petitioner has not argued that the state procedural bar is inadequate or that it is inconsistently applied.  Instead Petitioner states "[a]s shown by lodgment no. 6 (Court of Appeal Opinion) and no. 10 (Superior Court order denying petition) the petitions [sic] claims in grounds three, four, and five, are "procedurally barred" from review."  (Traverse at 9.)  Petitioner has cited no authority and no factual allegations to rebut Respondent's procedural default defense.  Therefore, Petitioner has not met his burden under <u>Bennett</u>.  As a result, his due process claims in grounds 3 and 5 are procedurally defaulted.

Petitioner fails to demonstrate (1) cause for the procedural default and actual prejudice from the claimed violation, or (2) that the failure to review the claim would result in a fundamental miscarriage of justice.  <u>See</u> <u>Coleman</u>, 501 U.S. at 750.

He asserts the ineffective assistance of appellate counsel is the cause for the procedural default.  (Traverse at 10.)  However, Petitioner neither shows how appellate counsel's performance was professionally unreasonable nor a reasonable probability that the outcome would be different if his claims in grounds 3 and 5 had been brought.  <u>See</u> <u>Williamson</u>, 936 F.2d at1006.

Petitioner has also failed to demonstrate that a miscarriage of justice would result absent review of these claims by this Court.  <u>See</u> <u>Coleman</u>, 501 U.S. at 748; <u>Vansickel</u>, 166 F.3d at 957-58.  The Court is, therefore, precluded from considering the merits of this claim.  Even if these claims

---

[5] <u>See</u> <u>In re Robbins</u>, 18 Cal. 4th 770 (1998); <u>In re Dixon</u>, 41 Cal. 2d 756 (1953).

1  were not procedurally barred, they lack merit.

2          **b. Merits**

3              **i. Ground 3 - Due Process Claim**

4      In ground 3, Petitioner asserts his due process rights were violated when the trial court

5  denied evidence requested by the jury to examine during deliberations, instructed "the jury that a

6  unanimous verdict is not necessary for a factual finding of guilt for the allegation of murder," and

7  allowed a partial readback of Petitioner's trial testimony.  (Petition at 8, Traverse at 11.)

8      "Trial error 'occur[s] during the presentation of the case to the jury' and is amenable to

9  harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other

10  evidence presented in order to determine [the effect it had on the trial].'"  <u>Brecht v. Abrahamson</u>,

11  507 U.S. 619, 629 (1993) (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 307-08 (1991)).

12      As previously noted, Petitioner does not clearly state what evidence the jury requested to

13  examine during deliberations.  However, it appears from the Court's thorough review of the record

14  there was one instance when the trial court denied the jury's request to "see the car (red saturn)"

15  where Ms. Norris was killed.  (Lodgment 1, Vol. 2 at 234-35.)  The trial court explained its denial

16  by stating "[t]he car itself was not entered into evidence."  (<u>Id.</u>)  Although Petitioner frames his

17  argument as a federal due process claim, he is essentially challenging the trial court's error in

18  applying California's evidence code and federal habeas relief is not available for an alleged error in

19  the interpretation or application of state law.  <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68.

20      As to Petitioner's claim that the jury was instructed that they need not reach a unanimous

21  verdict to find guilt, the Court's review of the record shows the trial court never provided such

22  instructions.  On the contrary, both the written jury instructions and the transcript of the verbal jury

23  instructions state the jury must agree unanimously whether the defendant is guilty or not guilty, and

24  if the jury finds him guilty, the jury must agree unanimously whether he is guilty of murder of the

25  first degree or murder of the second degree or voluntary manslaughter.  (Lodgment 2 at 735;

26  Lodgment 1 at 121.)  As such, Petitioner fails to demonstrate a due process violation when the error

27  he alleges does not appear to have even taken place.

28      Finally, Petitioner argues that the trial court erred by providing the jury with partial

readbacks of testimony when it previously instructed that partial readbacks would not be permitted. However, the record indicates that there was no instruction forbidding the partial readback of testimonies. The jury was given CALJIC 17.48 which stated, in pertinent part, "you may write the court requesting that the reporter readback [] relevant proceedings." (Lodgment 1, Vol. 1 at134, 205.) When the trial judge read these instructions to the jury, the trial judge further explained:

> "On a note on any requests that might come out of the jury for readbacks, occasionally jurors will say 'Well, I'd like to hear all the testimony – or we'd like to hear all testimony that relates to this subject from one or two or three witnesses.' And we cannot do that for you because it would mean counsel and I are picking and choosing everything that may or may not apply to that issue, and it's just too dangerous. We might leave out something that's crucial or include things that shouldn't have been included. And so we don't want to stress anything or leave anything out.
>     We generally will reply to you, if you are requesting a readback, we will offer the entire witness's testimony as a readback rather than portions that might be picked out. And then once the readback starts, it goes from the beginning of that witness all the way to the end unless all 12 jurors are satisfied that they heard enough. And the reporter can then stop reading in the middle."

(Lodgment 2, Vol. 4 at 755-56.)

It appears Petitioner misunderstood the trial court's instructions. Here, the jury requested a readback of Petitioner's entire cross-examination. (Lodgment 1, vol. 2 at 240, 244.) The trial judge even requested clarification that the jury only wanted the cross-examination and further offered Petitioner's direct and re-direct examinations. (Id. at 241.) Based on the agreement of all twelve jurors, the trial judge provided the jury with Petitioner's entire cross-examination. (Id. at 245.) As such, the trial court did not select portions of Petitioner's testimony. Thus, it appears the trial court did not err by allowing a readback of Petitioner's cross-examination since its actions comport with the its jury instructions as relates to CALJIC 17.48.

Based on the foregoing analysis, the Court RECOMMENDS the Petition be DENIED based on this ground for relief.

### ii. Ground 5 - Due Process Claim

In ground 5, Petitioner claims there was insufficient evidence for the jury to find him guilty of first degree murder. (Petition at 9.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re

1   Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally a state court conviction

2   does not determine whether it is satisfied that the evidence established guilt beyond a reasonable

3   doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the

4   prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

5   reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); Payne v. Borg, 982 F.2d 335,

6   338 (9th Cir. 1992).  Only if no rational trier of fact could have found proof of guilt beyond a

7   reasonable doubt may the writ be granted.  Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.  The

8   "prosecution need not affirmatively 'rule out every hypothesis except that of guilt'," and the

9   reviewing federal court "faced with a record of historical facts that support conflicting inferences

10  must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved

11  any such conflicts in favor of the prosecution, and must defer to that resolution."  Wright v. West,

12  505 U.S. 277, 296-97 (1992) (quoting Jackson, 443 U.S. at 326).

13          The Court finds that sufficient evidence supports Petitioner's conviction.  The evidence in

14  the case included the Petitioner's own testimony that (1) he became jealous when Ms. Norris called

15  to say she would not be coming home from Ocampo's, and that he drove to Ocampo's the next

16  morning and killed her; (2) he stabbed her with an awl and that afterwards he grabbed some rope

17  and tied it around her neck and hung her; (3) that after stabbing and hanging her, he left his wife in

18  the car and did not call 911, the ambulance, or anyone for help;  (Lodgment 2, vol. 3 at 602-06, 609-

19  10, 613-14.)  The medical examiner also testified that he counted 230 stab/puncture wounds on Ms.

20  Norris to the head, neck, chest, and left hand and arm.  (Lodgment 2, Vol. 1 at 148-49.)  Taking the

21  evidence in the light most favorable to obtaining a conviction, the Court finds sufficient evidence

22  supports the jury verdict that Petitioner was guilty of first degree murder, using a deadly weapon.

23  Accordingly, the Court RECOMMENDS that the Petition be DENIED based on this ground for

24  relief.

25                                    **VI. CONCLUSION**

26          After thorough review of the record in this matter and based on the foregoing analysis, this

27  Court recommends that the Petition for Writ of Habeas Corpus be DENIED and this action be

28  DISMISSED WITH PREJUDICE.  This Proposed Findings of Fact and Recommendation for

1  Disposition of the undersigned Magistrate Judge is submitted to the United States District Judge

2  assigned to this case, the Honorable Napoleon A. Jones, Jr., pursuant to the provisions of 28 U.S.C.

3  § 636(b)(1) (2007) and Local Rule 72.1(d).

4       IT IS HEREBY ORDERED that **September 19, 2008**, any party may file and serve written

5  objections with the Court and serve a copy on all parties.  The document should be captioned

6  "Objections to Report and Recommendation."

7       IT IS FURTHER ORDERED that any reply to the objections shall be filed and served **no**

8  **later than ten days** after being served with the objections.  The parties are advised that failure to

9  file objections within the specified time may waive the right to raise those objections on appeal of

10  the Court's order.  <u>Martinez v. Y1st</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

11      **IT IS SO ORDERED.**

12

13  DATED:  August 18, 2008

14

15              LOUISA S PORTER
            United States Magistrate Judge

16

17  cc:      The Honorable Napoleon A. Jones, Jr.

18          all parties

19

20

21

22

23

24

25

26

27

28

07cv0945-J (POR)