1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRANDON LEE NORRIS,<br><br>                                    Petitioner,<br><br>                    v.<br><br>DEBRA DEXTER, Warden,<br><br>                                    Respondent. | Civil No.    07cv945-J (POR)<br><br>**ORDER:**<br><br>**(1) ADOPTING MAGISTRATE JUDGE PORTER'S REPORT AND RECOMMENDATION; and**<br><br>**(2) DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE.** |

        The matter before the Court is Magistrate Judge Louisa Porter's Report and Recommendation (R&R) that the Petition for Writ of Habeas Corpus be denied with prejudice. [Doc. No. 27.] Petitioner has filed Objections to the R&R.  [Doc. No. 28.]  For the reasons set forth below, the Court **ADOPTS** the R&R and **DENIES** the Petition **WITH PREJUDICE**.

*Factual Background*

        The following presentation of facts is taken from the California Court of Appeal's opinion in *People v. Norris*, No. SCD 164985 (Cal. Ct. App. Sep. 1, 2004). (Lodgment No. 6.) The Court presumes these factual determinations are correct.  28 U.S.C.A. § 2254(e)(1).)

**A. The Prosecution's Case**

        Norris and his wife Lori were both in the Navy. They had a son, Dante, who was born in 1999. From March 2001 to October 2001, Lori was stationed in Maine and Norris was stationed in San Diego. During this time period, Lori began an extra-

marital affair with another Navy sailor named Jeffrey Ocampo. In the spring of 2001, Norris had a six-week affair with a woman named Kay Smith. From July 2001 to October 2001, Norris also had a friendship with another woman named Alexis Marosi. Marosi slept with Norris in his bed many times, and they kissed and "cuddle[d]" together, but never had sex.

In September 2001, while Lori was on leave in San Diego, she and Norris mutually agreed to separate. The next month, however, Norris and Dante traveled to Galveston, Texas, where Lori's ship was being commissioned. After this visit, Lori broke off her relationship with Ocampo and Norris stopped seeing Marosi.

Lori's ship returned to San Diego in November 2001. Shortly afterward, Lori resumed her affair with Ocampo. After Thanksgiving, Norris began having an affair with a coworker named Brandi Kauffman. Norris told Kauffman that he and Lori were living together because of their son, but that they led separate lives, and Lori was seeing somebody else. Two days after Thanksgiving, Kauffman called Lori and confirmed that she was seeing somebody else. According to Kauffman, her relationship with Norris continued until Lori's death. Kauffman spent nights at Norris's apartment when Lori was gone. During this time period, Lori and Norris decided to get a divorce.

On New Year's Eve, Lori told Norris that Ocampo was her boyfriend. Norris became upset.

On January 2, 2002, Norris came to Lori's ship while she was working. They argued and Lori began crying. Norris left the ship.

On the evening of January 9, 2002, Lori went to a movie with Ocampo. Afterward, she decided to spend the night at Ocampo's apartment. Sometime after midnight, Lori called Norris to tell him that she would not be coming home that night, and that she would be home in the morning to pick up her work uniform. The next morning, Lori asked Ocampo if she could borrow some of his work clothing so that she would not have to return home. Ocampo agreed. Lori left Ocampo's apartment around 6:15 a.m. Ocampo did not walk her out of the apartment.

According to his cellular telephone records for the morning of January 10, 2002, Norris made numerous attempts to reach Lori on her cellular telephone from 4:32 a.m. until 6:14 a.m. At 6:13 a.m., Norris called his employer and left a message saying that he had a flat tire and would be late to work. Around 6:25 or 6:30 a.m., a witness observed Norris's car parked behind Lori's car in a parking lot near Ocampo's apartment. Norris's car backed up, turned into a parking stall, and then drove away. Lori's car remained parked in the same spot.

A few hours later, another witness noticed someone inside Lori's car. The witness called the police. When the police arrived, they discovered Lori's dead body in the back seat of her car. She was hanging from a cord that was wrapped twice around her neck and tied to the clothes hook above the window. The cord had been ripped from a mesh storage pouch inside the vehicle. Lori also had 230 puncture wounds to her head, neck, chest, and left hand and arm. Some of the injuries were defensive wounds. The cause of death was multiple stab wounds and hanging. Lori was still alive when she was hanged, but there was no sign that she resisted the hanging.

Norris dropped Dante off at his daycare center between 7:30 and 8:00 a.m. that morning. He usually dropped Dante off between 6:00 and 6:30 a.m. In the sign-in book, Norris wrote that he had dropped Dante off at 6:30 a.m. Norris arrived at work between 8:00 and 8:30 a.m.

That night, Norris called his friend, Erica McGrath, and asked her to go to his apartment and get rid of something in the dishwasher. She refused. The next day, the police recovered an awl from Norris's dishwasher. The awl was part of a tool set, the rest of which was discovered in the front passenger area of Norris's vehicle. The stab wounds could have been inflicted by the awl.

Ocampo had been in Lori's car two days before she was killed. He had not seen an awl in the car. Lori had never talked to him about etching the dashboard of

1    the car.

2    *Norris*, slip op. at 2-4.

3    **B. The Defense's Case**

4         Norris testified in his own defense. He admitted that he had killed Lori by
     stabbing her with the awl and strangling her with a cord.

5         According to Norris, he and Lori had agreed to separate in November 2001.
     They continued living together and completed some paperwork for a divorce.

6    However, Norris was "furious" when Lori told him on New Year's Eve that the other
     person she had slept with was Ocampo. Norris had met Ocampo in Texas and bought

7    him a beer. He felt "disrespected" by Ocampo.
          On January 4, 2001, after Dante told Norris that he had seen Lori and Ocampo

8    kissing, Norris confronted Lori at work on the ship. That night, Norris packed up all
     of Lori's belongings in boxes. When she returned in the morning, he gave her some

9    money and told her to move out of the apartment. However, Lori convinced Norris to
     let her stay. They decided to make one more attempt to reconcile, and they agreed to

10   break off their other relationships. According to Norris, he told Brandi Kauffman that
     he could not see her anymore.

11        On January 9, 2002, Lori told Norris that she was going to the movies with
     Ocampo. Norris was angry and suspicious, but Lori assured him that he had nothing

12   to worry about because they were going out only as friends. She said she would be
     home that night. Sometime after midnight, however, Lori called Norris and said she

13   would not be coming home.
          Early the next morning, Norris repeatedly attempted to call Lori. He finally

14   drove to Ocampo's house, because he wanted to talk to Lori about their relationship.
     Dante was asleep in Norris's car. On the way to Ocampo's house, Norris called work

15   and left a message saying that he had a flat tire and would be late.
          As Norris approached Lori's parked car, he saw two people hug and kiss.

16   When the woman walked away and got into her car, Norris realized it was Lori. She
     started to drive away.  Norris pulled up behind Lori and flashed his headlights at her.

17   She pulled over into the parking lot and Norris got into her car. Lori asked him what
     he was doing there. He said he just wanted to talk.

18        Norris and Lori started arguing and shouting. After they had finished arguing,
     they sat in the car in silence. Norris reached over to hold Lori's hand. She pulled her

19   hand back and slapped him. Norris punched her, and Lori fought back.
          Norris grabbed the awl from the cup holder of Lori's car near the gearshift. He

20   had given the awl to Lori about a week or a week and a half earlier, because she
     wanted to use it to etch her name in her dashboard. Norris admitted stabbing Lori

21   repeatedly with the awl, but he did not realize he was doing it at the time. Lori fought
     back. At some point, they fell into the back seat. Norris continued stabbing her. He

22   remembered grabbing the rope in the back seat, but could not recall wrapping it
     around Lori's neck or hanging her. Later that day, he realized what he had done with

23   the rope. When Norris left, Lori was in the back seat of the car, bleeding and motion-
     less. Norris ran to his car and drove away.

24        In closing argument, defense counsel argued that the killing was not premedi-
     tated, and that Norris was guilty of either voluntary manslaughter or second degree

25   murder, but not first degree murder.

26   *Norris*, slip op. at 4-6.

27                              ***Procedural Background***

28   In the Superior Court of the State of California, for the County of San Diego, Petitioner was

-3-

tried and convicted by a jury of first degree murder, based on the January 10, 2002, killing of Petitioner's wife, Lori Norris, pursuant to California Penal Code §§ 187(a) and 189. The jury further determined that Petitioner personally used a deadly or dangerous weapon during the commission of the murder in violation of California Penal Code § 12022(b)(1). (Lodgment No. 1, vol. 2 at 218, 289.) The superior court sentenced Petitioner to serve an indeterminate term of 25 years to life in state prison, plus a consecutive one-year term for the weapon use enhancement. (*Id.* at 289, 332.)

Petitioner appealed the judgment to the California Court of Appeal. He argued the trial court erroneously admitted evidence of hearsay statements made by the victim, and that this error violated his Sixth and Fourteenth Amendment rights to confrontation. (Lodgment No. 3.) In a reasoned opinion filed September 1, 2004, the California Court of Appeal found that Petitioner failed to preserve the issue for review by failing to make a timely and specific objection to the hearsay evidence during trial, and denied Petitioner any relief. (Lodgment No. 6.) Petitioner filed a petition for review in the California Supreme Court, in which he raised the same issue presented to the court of appeal. (Lodgment No. 7.) The California Supreme Court denied his petition on November 17, 2004. (Lodgment No. 8.)

On December 2, 2005, Petitioner filed a petition for writ of habeas corpus in the California Superior Court. (Lodgment No. 9.) In a written order filed January 20, 2006, the superior court rejected Petitioner's claims. (Lodgment No. 10.) On March 10, 2006, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal. (Lodgment No. 11.) On May 17, 2006, in a written order, the court of appeal denied the petition. (Lodgment No. 12.) On September 11, 2006, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. (Lodgment No. 13.) On April 11, 2007, the California Supreme Court summarily denied the petition. (Lodgment No. 14.)

On May 23, 2007, Petitioner filed a petition for writ of habeas corpus in this Court. [Doc. No. 1.] The Attorney General of the State of California filed an answer to the petition on August 28, 2007. [Doc. No. 17.] On October 5, 2007, Petitioner filed a traverse to respondent's answer. [Doc. No. 25.]  Magistrate Judge Louisa S. Porter filed a report and recommendation on August 18, 2008 recommending that the petition be denied with prejudice. [Doc. No. 27.] Petitioner filed objections

to the R&R on September 18, 2008. [Doc. No. 28.]

*Legal Standard*

**A.      Reviewing a Magistrate Judge's Report and Recommendation**

The duties of the district court in connection with a magistrate judge's R&R are set forth in Rule 72(b) and 28 U.S.C. § 636(b)(1).  *See* Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1) (2005).  The district court must "make a de novo determination of those portions of the report ... to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1) (2005); *see United States v. Raddatz*, 447 U.S. 667, 676 (1980).

When no objections are filed, the Court may assume the correctness of the Magistrate Judge's findings of fact and decide the motion on the applicable law.  *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974).  Under such circumstances, the Ninth Circuit has held that "a failure to file objections only relieves the trial court of its burden to give *de novo* review to factual findings; conclusions of law must still be reviewed *de novo.*"  *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir. 1989).

**B.      § 2254 Petition**

A federal court must grant habeas relief to a petitioner in state custody if the petitioner is in custody "in violation of the Constitution or other laws or treaties of the United States."  28 U.S.C. § 2254(a).  A federal court's duty in examining a state prisoner's habeas petition is governed by 28 U.S.C. § 2254 as amended by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA").  Pursuant to § 2254, a federal court may grant habeas corpus relief from a state-court judgment only if the adjudication was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  State interpretation of state laws and rules cannot serve as the basis for a federal habeas petition, as no federal or constitutional question would be implicated.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (stating that "federal habeas corpus relief does not lie for errors of state law;" federal courts may not reexamine state court determinations on state law

issues).

### 3. Deference to Findings of Fact

Deference must be given to state court findings of fact. Under section 2254(e)(1), federal courts must "give great deference to the state court's factual findings." *Jeffries v. Wood*, 114 F.3d 1484, 1499-1500 (9th Cir. 1997), *rev'd on other grounds*, *Lindh v. Murphy*, 521 U.S. 320. All factual issues determined by the state court are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner may rebut this presumption by clear and convincing evidence. *Id.*

### *Discussion*

Petitioner alleges the following five grounds for habeas relief: 1) ineffective assistance of appellate counsel; 2) ineffective assistance of trial counsel; 3) trail court errors; 4) prosecutorial misconduct; and 5) insufficiency of evidence. [Doc. No. 1.]

### A. Ineffective Assistance of Counsel

To make out a claim of ineffective assistance of counsel, Petitioner must show (1) "that counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668 (1984). The court need not address both the performance prong and the prejudice prong if the petitioner fails to make a sufficient showing of either. *See id.* at 700. The *Strickland* test applies in full force in federal collateral proceedings. *Id.* at 697.

Deficiency of counsel, the first prong of the *Strickland* test, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." *Id.* at 688. Furthermore, judicial scrutiny of counsel must be highly deferential because of the risk that the benefit of hindsight would make the counsel's performance seem unreasonable. *Id.* at 689.

The second prong of the *Strickland* test requires that any deficiency of counsel also be prejudicial. *Id.* at 692. Therefore, even if a defendant is able to show that counsel acted unreasonably, he still must show that counsel's actions had an adverse effect on the outcome. *Id.* at 693. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

1        **1.      Ground 2 - Ineffective Assistance of Trial Counsel**

2        Petitioner argues his Sixth Amendment right to effective assistance of counsel was violated

3   when his trial counsel: (1) failed to object to hearsay testimony; (2) failed to ensure presentation of

4   probative expert testimony necessary to the defense; (3) failed to object to the read back of hearsay

5   testimony during deliberations; (4) failed to object to the trial court's denial of the jury's request to

6   review evidence; and (5) failed to object to the instruction that the jury need not reach a unanimous

7   verdict for guilt.[1]

8        **a.      Hearsay Testimony**

9        Petitioner claims that the trial court erroneously admitted hearsay testimony from two

10  witnesses, Irish Kelly and Jeff Ocampo, without any limiting instructions. [Doc. Nos. 1. and 28.]

11  The trial court ruled that such testimony concerning Petitioner's alleged controlling behavior could

12  be admitted to establish the state of mind of the victim, Ms. Norris, prior to the murder.[2]  (Lodgment

13  No. 2.) The court further ruled that this testimony should be accompanied by a limiting instruction at

14  the beginning of the testimony to instruct the jury not to consider this testimony for the truth of the

15  matters asserted. (*Id.*)

16        The Magistrate Judge's R&R did not directly address Petitioner's claims regarding the

17  potentially prejudicial testimony about his alleged controlling behavior. According to the R&R,

18  Petitioner misrepresented the trial proceedings because part of Ocampo's testimony was ruled

19  inadmissible during the in-limine hearing and Kelly's testimony was only admissible along with a

20  limiting instruction.  Petitioner filed an objection to this finding, citing specific testimony given by

21  Ocampo and Kelly concerning his allegedly controlling behavior. [Doc. No. 28 at 4-5.]  As such, the

22  Court has examined the trial record anew.

23        From the trial records, it is apparent that the trial court did in fact admit potentially prejudi-

24  ───────────────

25        [1] Since Petitioner's arguments concerning appellate counsel's alleged ineffectiveness stem in

26  part from trial counsel's ineffectiveness, the Court first analyzes Ground 2.

27        [2] Though Ocampo testified to similar instances of controlling behavior, (*see*, *e.g.*, Lodgment No.

28  2 at 275-77), Petitioner did not raise this as an issue prior to the Objections.  As such, the Court only

    considers the hearsay testimony by Kelly.

cial testimony without a limiting instruction to the jury. Kelly testified that Petitioner "would hide [the victim's] keys, hide her ATM cards, hide her cell phone, take her cell phone." (Lodgment No. 2 at 305.)  She also testified that "[the victim] wasn't allowed to go anywhere with Dante [Petitioner and victim's son]." (Id. at 5.) Ocampo testified that "she [victim] was basically in a lockdown at her house, and she described it as being in prison in her own house. . ." (Lodgment No. 2 at 275.) This is the kind of potentially prejudicial testimony contemplated by the trial court's in-limine ruling yet no cautionary instruction was provided at the time of trial nor did Petitioner's counsel make an objection. (Lodgment No. 2.)

However, trial court errors aside[3], when reviewing trial counsel's performance under *Strickland*, Petitioner has failed to demonstrate that trial counsel's performance was patently deficient and fell below an objective, reasonable standard.  As noted earlier, judicial scrutiny of counsel's performance must be highly deferential.  *Strickland*, 466 U.S. at 689. In the midst of trial, especially a complex murder trial, counsel may have various strategic reasons not to object to the introduction of certain testimony. The decision not to request a limiting instruction is "solidly within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence." *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (citing *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996). However, an attorney's failure to request instructions limiting the use of possibly prejudicial testimony can, in some cases, amount to ineffective assistance where the testimony is used, without objection, as propensity evidence. *Id.* (holding that any "strategic basis for failing to request a limiting instruction vanished when, during closing arguments, the prosecutor pointed to [defendant's] statements as uncontroverted evidence of premeditation).

For tactical reasons, Petitioner's counsel may have chosen not to object to the court's failure to provide limiting instructions out of concern that doing so would only highlight those damaging statements. It is likely that trial counsel did not object for strategic reasons because he consciously

---

[3] Federal courts may not reexamine state court determinations on state law issues. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (holding that "federal habeas corpus relief does not lie for errors of state law.")

chose to refrain from later requesting a limiting instruction prior to jury deliberation. During jury instruction deliberations, the court said, "We've had an awful lot of statements . . . that have come in. I have not made a special limiting instruction at this point. There's been so much and it's rolled in." (Lodgment No. 2 at 439.) Petitioner's counsel then replied,  "I don't think we need a limiting instruction at this point." (*Id.* at 440.) Petitioner's counsel was aware of the potentially harmful testimony that was given at trial but felt a limiting instruction would not be necessary; perhaps it might have been even more damaging if the jury's attention was drawn to those statements by any objection on counsel's part.

Furthermore, the prosecution did not offer the testimony as propensity evidence in order to draw an inference that Petitioner's controlling behavior predisposed him to murdering his wife. The prosecution only offered the testimony to prove the victim's state of mind at the time of the attack. In Petitioner's denial of appeal from the Superior court, the California Court of Appeals stated in their analysis that the "trial court believed that the admissibility of these statements depended on their relevance and probative value to prove the victim's state of mind and to rebut the defense claim of provocation." (Lodgment No. 6.) Petitioner's counsel was likely aware of this when he deliber-ately chose not to request a limiting instruction. The matter had been discussed at length during the in-limine hearing between the court, prosecution, and defense. (Lodgment No. 2.) Admittedly, his counsel's decision not to object meant the issue would not be preserved for later review. Neverthe-less, this does not substantiate a claim of ineffective assistance of counsel under the *Strickland* standard requiring objective unreasonableness.

In the absence of any evidence that Petitioner's counsel's failure to object to the hearsay testimony given by Kelly was not strategic, the Court **FINDS** that trial counsel's performance did not fall below the objective standard of reasonableness and was therefore not deficient.  As such, the Court does not need to address the second prejudice prong of the *Strickland* criteria with respect to this claim.

### b.      Failure to present expert testimony

Petitioner asserts that trial counsel was ineffective because he failed to present an expert witness to testify at trial. [Doc. No. 25 at 7.]  Petitioner contends that an expert was necessary to

support his argument that his "'reason' was obscured by passion, sending [him] into a 'violent rage,' upon the instant provocatory [*sic*] act of being slapped in the face. [*Id.* at 19.]  The Magistrate determined that trial counsel's decision not to produce an expert witness was not objectively deficient. [Doc. No. 27 at 10.]  Petitioner has filed no objections to this determination.

Petitioner fails to establish that trial counsel's decision not to have an expert witness testify was deficient.  Although trial counsel did not call an expert witness to testify, he utilized the testimony of Petitioner and Detective Ott to support Petitioner's defense that his actions were not premeditated and there was reasonably sufficient provocation from the victim to mitigate the first degree murder charge to either second degree murder or voluntary manslaughter. (Lodgment No. 2. at 688-715.)  In support of this defense, trial counsel primarily focused on Petitioner's testimony. Petitioner testified that (1) he drove to Ocampo's apartment with his son in the car, (2) at the time he decided to drive to Ocampo's apartment he intended to talk to his wife, (3) the thought of going to Ocampo's apartment to kill his wife did not enter his mind, and (4) he did not have the intent to harm his wife when he arrived at Ocampo's apartment. (*Id.* at 602-3, 668-9.)

In his closing argument, trial counsel emphasized Petitioner's testimony and the fact that he drove to Ocampo's apartment with his son to illustrate his actions were not premeditated.  (*Id.* at 688-715.)  Additionally, trial counsel reminded the jury of Detective Ott's testimony regarding the letter "B" etched on the dashboard of Ms. Norris' car, arguing that this supported Petitioner's testimony that the murder weapon, an awl, was already in his wife's car and that he did not bring it with him with the intent to murder his wife. (*Id.* at 506-10.)

Given the ample development of Petitioner's provocation defense by lay witness testimony, there is no reason that Petitioner required an expert witness with special knowledge, skill, experi-ence, training, or education.[4]  Petitioner does not contend he was entitled to an expert because trial counsel should have asserted a defense of diminished capacity or insanity.  Even so, there is nothing in the record to indicate that Petitioner suffered from diminished capacity, insanity, or any other

---

[4] In California, a person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.  CAL. EVID. CODE § 720(a) (2008).

1    mental illness requiring an expert witness to testify.

2         Finally, as a matter of historical practice, the determination of the sufficiency of provocation

3    is usually within the provenance of the jury based on reasonableness under the circumstances, as it is

4    in California. *See* CALCRIM 570; (Lodgment 2 at 745). Such a determination does not require an

5    expert witness, for it calls on the jury to make an objective determination based on its experience.

6    Thus, based on trial counsel's defense strategy and presentation of evidence, the Court **FINDS** that

7    trial counsel's decision not to produce an expert witness was not deficient.

8              **c.    Partial read back of testimony to Jury**

9         Petitioner argues trial counsel failed to object when the trial court permitted a "customized"

10   read back of testimony during jury deliberations and that this prejudiced the defense. [Doc. No. 7. at

11   1.] The Magistrate Judge found that the trial court did not error in its read back of Irish Kelly's

12   testimony or Petitioner's testimony. (R&R at 10-11). Petitioner objects to this finding, arguing that

13   the trial court incorrectly complied with a jury request to read back only a portion of Petitioner's

14   testimony. [Doc. No. 28 at 5-6.]

15        Although trial courts have significant discretion in the conduct of their trials, during jury

16   deliberations a " jury should ordinarily be provided with the witness's entire testimony-i.e., direct

17   *and* cross-examination, and should be admonished to weigh all the evidence and not focus on any

18   portion of the trial." *United States v. Richard*, 504 F.3d 1109 (9th Cir. 2007). At trial, the judge

19   complied with the jury's request of a full read back of Irish Kelly's testimony but only a portion of

20   Petitioner's testimony, specifically his cross-examination. (Lodgment No. 1. at 235, 241, 245). Thus,

21   although a full read back of Irish Kelly's testimony was provided, Petitioner correctly asserts that

22   only a partial read back of his testimony was provided. [Doc. No. 28 at 5.]

23        However, Petitioner's complaint is not directed at the trial court's error, but rather his

24   counsel's error for failing to object. Petitioner has framed this issue as an ineffective assistance of

25   counsel claim. As such, the Court will only address whether trial counsel's failure to object to a

26   partial read back of Petitioner's testimony, his cross-examination, violated the *Strickland* standard.

27        First, the Petitioner must show that his counsel's failure to object was objectively unreason-

28   able. After a thorough review of the transcript, the Court can find no evidence that counsel was

1   actually aware of the jury's request for Petitioner's cross-examination testimony only.  The record

2   shows written communications between the judge and jury but it is unclear whether Petitioner's

3   counsel was ever aware that the jury had requested only a partial read back of Petitioner's testimony.

4   (Lodgment No. 1. at 240-245.) Therefore, the Court must assume that trial counsel was never

5   notified of the request, thus making it impossible for counsel to object.

6          Secondly, Petitioner must also show that counsel's failure to object was prejudicial and that

7   "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, the

8   Petitioner has not raised any plausible doubt that the jury's ultimate finding of guilt would have been

9   different had counsel objected. Even if Petitioner's counsel knew of and objected to the partial read

10  back of only Petitioner's cross examination, the likelihood that the jury would have returned a

11  different verdict is very slim. The evidence presented  at trial would likely have been sufficient to

12  convict Petitioner regardless of the trial court's decision to read back only a portion of Petitioner's

13  testimony during jury deliberations. Petitioner admits to having killed his wife who died after being

14  stabbed 230 times and then hung from a coat hanger in the back seat of her car. (Lodgment No. 2.)

15  Petitioner argues that his conviction of first degree murder, requiring premeditation (Lodgment No.

16  2 at 737), would have been different had the jury heard more than his cross examination during

17  deliberations. However, even a full read back of Petitioner's entire testimony, including his direct

18  testimony, would not have supported his defense that the murder was an unplanned, frenzied attack

19  made in the heat of passion.  During his direct examination by counsel, Petitioner admitted that he

20  and his wife had severe marital issues and that on the morning of the murder he had called her

21  repeatedly to no avail because his wife, the victim, never answered her phone. (Lodgment No. 2. at

22  603.) Furthermore, during direct testimony, Petitioner never offered an explanation for his failure to

23  call 911 after realizing his wife had been stabbed.(Lodgment No. 2.) Finally, although Petitioner

24  argues in his Objection that his son's presence nearby during the murder undermines the prosecu-

25  tion's allegation that the murder was premeditated, Petitioner did not testify to such facts during

26  direct and re-direct examination. So even had the court read back Petitioner's entire testimony to the

27  jury, including direct and re-direct examination, the outcome would likely have been the same

28  because there was no exculpating evidence in the other portions of Petitioner's testimony.

1    Therefore, Petitioner's counsel's performance was not objectively deficient and prejudicial

2    under *Strickland* for failing to object to the trial court's partial read back of Petitioner's testimony.

3                      **d.      Denial of Evidence for Jury Review**

4    Petitioner claims his trial counsel was ineffective because he failed to object to the trial

5    court's denial of the jury's request to review evidence. [*See* Doc. No. 1 at 7.]  Petitioner does not

6    specify what evidence the jury requested to examine during deliberations. After a thorough review

7    of the record, it appears the trial court did deny the jury's request to "see the car (red Saturn)" where

8    Ms. Norris was killed. (Lodgment No. 1 at 234-35.) The trial court explained its denial by stating

9    "[t]he car itself was not entered into evidence." (*Id.*)

10   Petitioner fails to logically explain how trial counsel's performance was deficient by not

11   objecting to the trial court's denial of the jury's request to view an item that was never entered into

12   evidence. Additionally, Petitioner does not show how he was prejudiced by counsel's failure to

13   object. Thus, Petitioner fails to meet his burden under *Strickland.*

14                     **e.      Unanimous Verdict Jury Instruction**

15   In his objection, Petitioner claims trial counsel should have objected when the trial court

16   erroneously instructed the jury that it did not need to unanimously agree on a singular theory of guilt

17   for a particular degree of crime. [Doc. No. 28 at 6.] Petitioner believes the trial court incorrectly told

18   the jurors they did not need to agree to a particular theory of guilt. According to the trial transcript,

19   the trial court informed the jury:

20        "For a finding of guilty as to Count 1, all 12 jurors must agree to the same degree or level of
          crime. It is not necessary, however, that all 12 jurors agree as to the same theory of guilt for
21        that degree or level of crime." (Lodgment No. 2, vol. 4 at 735.)

22   The court explained that several theories were available,

23        "The jury may consider three theories of guilt as to first-degree murder. They are: one,
          express malice murder with premeditation and deliberation. Two, felony murder. That's
24        torture murder. Three, murder by torture." (*Id.*)

25   There is longstanding rule that jurors are not generally required to unanimously agree on the

26   preliminary factual issues underlying the verdict. *Schad v. Arizona*, 501 U.S. 624, 631 (1991) (citing

27   *McKoy v. North Carolina*, 494 U.S. 433 (1990)). As the court explained,  "different jurors may be

28   persuaded by different pieces of evidence, even when they agree upon the bottom line." *McKoy,* 494

                                           -13-

U.S. at  449.

Petitioner does not cite case law or specific statutory guidance from the California code to support his claim that a jury must unanimously agree on a singular theory of guilt for first degree murder. The jurors in Petitioner's case may have all been persuaded in different ways by different pieces of evidence offered by the prosecution. The trial court's correct instruction to jurors that the "bottom line" degree of murder be unanimous was not undermined by a subsequent instruction that the underlying theory of guilt did not need to be unanimous. Petitioner argues that the trial court effectively "prejudiced the presumption of innocence and reasonable doubt clauses." [Doc. No. 28.] Yet Petitioner has not shown how the court's instructions prejudiced his presumption of innocence.

### 3.    Ground 1 - Ineffective Assistance of Appellate Counsel

Petitioner contends that he received ineffective assistance of appellate counsel, arguing that his counsel raised none of the issues Petitioner instructed him to raise. Petitioner lists several issues he believes appellate counsel should have raised: (1) trial court's errors of practice and procedures; (2) ineffective assistance of trial counsel; and (3) insufficiency of evidence. [Doc. No. 1 at 6.] However, with respect to each claim, Petitioner fails to demonstrate how appellate counsel's assistance was ineffective.

The standard for assessing the performance of trial and appellate counsel is the same. *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1991). Thus, claims of ineffective assistance of appellate counsel are also reviewed according to *Strickland*'s two-pronged test. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). First, Petitioner must establish that appellate counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, a petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. *Id.* at 694. The presumption of reasonableness is even stronger for appellate counsel because he has wider discretion than trial counsel in weeding out weaker issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Appellate counsel has no constitutional duty to raise every non frivolous issue requested by a petitioner. *Id.* at 1434 n.10 (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).

**1. Trial Court Errors**

Petitioner's first claim, that appellate counsel did not raise the issue of trial court errors, is unfounded. The trial records from the state court proceedings clearly show that appellate counsel, on direct appeal, did in fact raise the issue of the trial court error; specifically the admission of hearsay testimony from witnesses Kelly and Ocampo. (Lodgment No. 5 at 19). In Petitioner's appeal, appellate counsel argued that contrary to the trial court's ruling, "the hearsay evidence of Ms. Norris's statements was not admissible pursuant to evidence code section 1250 [hearsay]." (*Id.*) For several pages, appellate counsel provided legal analysis explaining why the trial court erred in admitted testimony from witnesses who had spoken with Ms. Norris about her husband's controlling behavior. Since appellate counsel did in fact raise the issue of trial court error, Petitioner's first claim for ineffective appellate counsel should be dismissed.

**2. Ineffective Assistance of Trial Counsel**

Petitioner's second claim, that appellate counsel did not raise the issue of ineffective assistance of trial counsel, does not substantiate Petitioner's view that appellate counsel was deficient under the Strickland standard.  As stated earlier, appellate counsel has no constitutional duty to raise every non frivolous issue requested by a client. *Miller*, 882 F.2d at 1434 n.10. Appealing every arguable issue would do disservice to a client because it would draw an appellate judge's attention away from stronger issues and reduce appellate counsel's credibility before the appellate court. *Id.* at 1428.

Considering the heightened deference given to appellate counsel to weed out weaker issues, Petitioner's appellate counsel acted reasonably in deciding not to appeal on the ground that trial counsel was ineffective. This Court has already concluded that trial counsel's performance was not deficient as defined under *Strickland*.  Petitioner's appellate counsel was aware that trial counsel did not object to the trial court's admission of the hearsay testimony but did not raise this on appeal. Appellate counsel noted in the opening brief,

> "Appellant recognizes that his trial counsel did not specifically object to this hearsay evidence . . . However, in view of the court's pre-trial ruling that Ms. Norris's statements to Kelly were admissible, any objection to [other] testimony about Ms. Norris's similar statements would have been futile.

(Lodgment No. 5 at 19.)

1    Appellate counsel's acknowledgment of Petitioner's grievances with his trial counsel

2    evidences a conscious, perhaps tactical, choice not to raise the issue to avoid detracting attention

3    away from more important matters or to prevent a loss of credibility in the eyes of the court by

4    raising a redundant complaint. Regardless of what appellate counsel's specific reasoning may have

5    been, her choice not to raise the issue of ineffective assistance of trial counsel cannot be classified as

6    objectively unreasonable under *Strickland.*

7    **3. Insufficiency of Evidence**

8    Finally, Petitioner's third claim, that appellate counsel's decision not to raise a claim of

9    insufficiency of evidence was unreasonable, is factually unsupported by the record. In both his

10   original petition and subsequent objection to the R & R, Petitioner simply faults his appellate

11   counsel for not raising grounds of "insufficiency of evidence" without any elaboration of the claim.

12   [Doc. No. 1 and 28.] Petitioner fails to explain why he believes there was insufficient evidence, only

13   stating  that the objection should have been made during direct appeal. Therefore, the Court will

14   construe Petitioner's argument as a claim that the evidence presented at trial was insufficient to

15   substantiate a conviction of first degree murder.

16   However, the totality of the evidence was sufficient for a jury to convict Petitioner of first

17   degree murder. Whenever a verdict is challenged based on trial evidence, courts presume the jury

18   reasonably resolved evidentiary disputes so long as sufficient evidence supports the verdict. *House*

19   *v. Bell*, 547 U.S. 518, 538 (2006) (citing *Jackson v. Virginia*, 443 U.S. 307, (1979)). CAL. PENAL

20   CODE § 189 states, "[a]ll murder which is perpetrated . . . by any . . .  kind of willful, deliberate, and

21   premeditated killing . . . is murder of the first degree." The evidence presented at trial could

22   reasonably lead an impartial jury to convict Petitioner of willfully and deliberately killing his wife.

23   Petitioner testified at trial that he was "furious" when Ms. Norris, the victim, told him on New

24   Year's Eve that she had slept with someone else. (Lodgment No. 6.) Petitioner also admitted that he

25   felt he had been "disrespected." (*Id.*) Petitioner also admitted to confronting Ms. Norris afterwards

26   on the ship she was working at. (*Id.*) Later, when Ms. Norris informed Petitioner that she would not

27   be returning home, Petitioner made repeated attempts to call her. (*Id.*) After she did not pick up the

28   phone he drove to her lover's home after calling into work where he left a message stating that he

had a flat tire and would be late. (*Id.*)

Therefore, it is difficult for Petitioner to argue that his appellate counsel was ineffective for failing to object and argue that there was insufficient evidence for a jury to convict him of willful, deliberate, and premeditated first degree murder.

**B. Procedural Bar**

Respondent argues that under the *Dixon* rule, grounds 3 (trial court error), 4 (prosecutorial misconduct), and 5 (insufficiency of evidence) of the petition are procedurally defaulted because Petitioner failed to properly present those claims to the state courts. [Doc. No. 17 at 11-16.] The Magistrate Judge found that Petitioner's claims were indeed procedurally barred. [Doc. No. 27 at 13 and 18.] Petitioner objects because he believes his counsel was at fault for failing to raise and preserve the issues. [Doc. No. 28 at 8.]

"The procedural default doctrine 'bar[s] federal habeas when a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement.'" *Calderon v. United States District Court (Bean)*, 96 F. 3d 1126, 1129 (9th Cir. 1996) (quoting *Colemen v. Thompson*, 501 U.S. 722, 729 (1991)). The doctrine "is a specific application of the general adequate and independent state grounds doctrine." *Bean*, 96 F.3d at 1129 (quoting *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994)). Under the adequate and independent state grounds doctrine, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support judgment." *Bean*, 96 F.3d at 1129 (quoting *Coleman*, 501 U.S. at 729); *see also Hill v. Roe*, 298 F.3d 796, 798 (9th Cir. 2002). The state bears the burden of proving an independent and adequate procedural default. *Bennet v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). Furthermore, the state procedural rule must be clear and "well established at the time of the petitioner's purported default." *Bean*, 96 F.3d at 1129 (quoting *Wells*, 28 F.3d at 1010).

Once the state meets its burden, federal courts are foreclosed from reviewing the claim(s) *unless* the petitioner can (1) "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or (2) demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 750. "Cause" is a legitimate excuse

for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991). The miscarriage of justice exception is limited to extraordinary cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt. *Johnson v. Knowles*, 541 F.3d 933, 938 (9th Cir. 2008) (citing *Schlup v. Delo*, 513 U.S. 298, 317 (1995)).

Petitioner argues that grounds 3, 4, and 5 should not be procedurally barred under the Dixon[5] rule because Petitioner's counsel's failure to object and preserve the issues for review is sufficient cause to excuse him from the general procedural bar doctrine. [Doc. No. 28.] While the United States Supreme Court has not precisely identified what constitutes cause, ineffective assistance of counsel under *Strickland*, may constitute cause for the procedural default. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993). However, attorney ignorance, inadvertence, or error short of what is constitutionally ineffective under the Sixth Amendment is not cause for a procedural default. *See Carrier*, 477 U.S. at 487. If counsel makes a tactical decision to forego a claim, counsel's error cannot constitute cause for a procedural default. *See Amadeo*, 486 U.S. at 222. Here, Petitioner's claims against both his trial and appellate counsel for ineffective assistance fall short of the constitutional guarantees of the Sixth Amendment as interpreted by *Strickland*. As discussed earlier in Grounds 1 and 2, Petitioner has not satisfied both requirements of the *Strickland* standard: (1) "that counsel's performance was deficient" and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner reiterates his previous arguments, citing counsel's failure to present and thus preserve the above issues for review. [Doc. No. 28 at 8.] Petitioner believes "this bar is the fruit of denial of petitioner's constitutional rights to adequate and effective counsel and violation of due process." [*Id.*]

No further discussion is warranted because it would merely be redundant of the prior discussion of ineffective assistance of counsel. "Petitioner contends that claims are not barred from

---

[5] Petitioner does not contest whether the Dixon rule itself is independent and adequate. [Doc. No. 28.] Thus, the Court is left to examine whether any exceptions apply to the procedural bar doctrine allowing the Court to reach the merits of Petitioner's claims.

Federal Habeas review as rejections (by state court) were a direct result of ineffective counsel, as shown in grounds one and two." [Doc. No. 25 at 3.]  Essentially Petitioner has first argued in Grounds 1 and 2 that his counsel was ineffective for failing to object to trial court and/ or trial counsel errors and preserving the issues for review. Petitioner then proceeds to argue that Grounds 3, 4, and 5 should not be procedurally barred as a result of counsel's failure. Logically, if Petitioner has failed on grounds 1 and 2 to show a Sixth Amendment violation for ineffective assistance of counsel, he cannot then prevail on grounds 3, 4, and 5 which are predicated on the very same claim. Without showing that his counsel's performance violated his 6th Amendment right, Petitioner cannot then show cause for ineffective assistance of counsel to excuse himself from the state's independent and adequate procedural bar precluding federal review.

Finally, Petitioner has not demonstrated how failure to consider his claims will result in a fundamental miscarriage of justice. Petitioner has not asserted his innocence. In fact, Petitioner admits to killing his wife. The only question at issue is a matter of degree, first degree murder or a lesser degree.

Thus, the state court judgment invoking the procedural bar precludes this court from reaching the merits of Petitioner's claim.

### Conclusion

After a thorough review of the record in this matter and based on the foregoing analysis, this Court **DENIES** the Petition for Writ of Habeas Corpus **with prejudice**.


**IT IS SO ORDERED.**


DATED: September 11, 2009

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge


cc:   Magistrate Judge Porter
      All Counsel of Record